2020 IL App (2d) 190862
No. 2-19-0862
Opinion filed October 26, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2840 |
| JON J. MIKI, | ) ) | Honorable Jeffrey S. MacKay, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Jon J. Miki, appeals from the judgment of the circuit court of Du Page County finding him guilty of two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(f) (West 2018)) based on his having committed the charged sexual acts while he held a position of trust, authority, or supervision in relation to the victim, A.B. He contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of holding a position of trust, authority, or supervision when he committed the sexual acts. Because the evidence was sufficient to show that defendant held a position of trust when he committed the sexual acts, we affirm.

¶ 2                                        I. BACKGROUND

2020 IL App (2d) 190862

¶ 3    Defendant was indicted on two counts of criminal sexual assault based on his committing an act of sexual penetration by knowingly making contact between his penis and A.B.'s mouth (720 ILCS 5/11-1.20(a)(4) (West 2018)) (counts I and III), two counts of criminal sexual assault based on his committing an act of sexual penetration by knowingly making contact between his mouth and A.B.'s vagina (720 ILCS 5/11-1.20(a)(4) (West 2018)) (counts II and IV), one count of aggravated criminal sexual abuse based on his knowingly touching A.B.'s breast (720 ILCS 5/11-1.60(f) (West 2018)) (count V), and one count of aggravated criminal sexual abuse based on his knowingly touching A.B.'s vagina (720 ILCS 5/11-1.60(f) (West 2018)) (count VI). All six counts alleged that when the sexual contacts occurred, (1) A.B. was at least 13 years old but younger than 18 years old and (2) defendant held a position of trust, authority, or supervision in relation to A.B.

¶ 4    At a bench trial, the court established the following facts. According to A.B., defendant coached her traveling soccer team from when she was in the sixth grade until February 2018, when she was 17 years old. Because defendant was the head coach, he was responsible for A.B.'s selection to the team. Defendant made her a captain of the team her last three years. A.B. would often ride alone to games with defendant. Her parents were aware of that. A.B. stopped playing soccer for defendant's team in February 2018 because she began playing on her high school team.

¶ 5    During the summer of 2017, defendant hired A.B. to work at his accounting firm. She earned $17 per hour to organize tax materials for various clients. She would sometimes ride alone with defendant to client meetings. Her parents were aware that she did. She submitted timesheets and was paid by check.

¶ 6    Beginning in February 2018, A.B. started working again for defendant. According to A.B., she worked through March. Although she had soccer practice until around 4:30 p.m. each day, she

- 2 -

would go into defendant's office a few days a week and work until 6 or 7 p.m. She never received a paycheck for the time she worked in February or March 2018. However, defendant told her that he was keeping track of the hours she worked.

¶ 7    Defendant and his family also attended A.B.'s church, where her father was the pastor. In 2018, she would often sit with defendant and his family at church instead of her own family and friends.

¶ 8    Before January 2018, A.B. talked a lot with defendant and thought of him as a second father. Because he was her coach and boss, she looked up to him. She and defendant would communicate almost daily via text, e-mail, phone, or FaceTime. Before January 2018, they talked mostly about soccer, defendant's children, church, and work.

¶ 9    After A.B. left the traveling team in February 2018 and began playing high school soccer, the nature of her phone conversations with defendant changed. Defendant began to comment on her looks and would tell her that she was beautiful.

¶ 10    The physical relationship between A.B. and defendant also changed. While at his office, defendant would hug her and kiss her on the forehead. Around the end of February or beginning of March 2018, while at the office, defendant kissed A.B. on the mouth. He did that on several occasions. The kissing took place in the stairwell, by the doors, and in defendant's car in the office parking lot. On one occasion, while in the car, defendant touched A.B.'s breast through her clothing.

¶ 11    During February and March 2018, A.B. continued to talk to defendant about high school soccer. He gave her extra workouts to do to prepare her for playing soccer in college. She would let him know that she completed the workouts. Depending on her progress, defendant would give

her further advice regarding additional workouts. Defendant asked her to send him pictures of her "abs" to see the progress she was making with her body.

¶ 12    The week of March 24 to March 31, 2018, A.B. was on spring break. Two times that week, she went to defendant's house when defendant's wife and children were away visiting family. Defendant told A.B. to tell her parents that she was going with him to client meetings.

¶ 13    One night, defendant made A.B. dinner. The other night, they watched a movie. According to A.B., both nights involved kissing. Then defendant took his and A.B.'s clothes off, and they had oral sex in the guest bedroom. Defendant placed his mouth on A.B.'s vagina, and she placed her mouth on his penis. A.B. testified that, on both occasions, defendant ejaculated in her mouth. Defendant also touched her bare vagina and breasts. Defendant also put his finger in her vagina and rubbed it. She touched his penis with her hand.

¶ 14    When asked how she felt about the two incidents at defendant's house, A.B. answered that she was unsure what to do and did not feel like she could say no. She felt that way because she had known defendant for a long time and trusted him.

¶ 15    A.B. admitted on direct examination that initially she did not tell the investigator about everything that happened between her and defendant. She explained that she was caught off guard and that it was hard for her to talk about it. She told her therapist more than she initially told the investigator because she felt more comfortable and could process the situation.

¶ 16    A.B. denied telling her therapist that the oral sex occurred at defendant's office. According to A.B., she and defendant engaged in oral sex, and defendant touched her breast and vagina. These acts occurred at defendant's house and not his office.

¶ 17    On cross-examination, A.B. admitted that it was not until two days before trial that she first told the prosecutors that defendant had ejaculated in her mouth. She believed that she had said to

the prosecutors that he did so both times she was at his house. She further admitted that there were parts of the sexual contacts with defendant that she was unsure of. She reiterated that she was working at defendant's firm in late March when the sex acts occurred.

¶ 18    A.B. agreed that, when she spoke to investigators, her therapist, and prosecutors, it was important that she be truthful and not withhold information. A.B. testified that she was truthful during her various interviews.

¶ 19    A.B. admitted that, when she worked for defendant during the summer of 2017, she prepared and submitted a timesheet. She would then receive a paycheck. She admitted that (1) she did not receive any pay while working in March 2018, and (2) there were no timesheets or paychecks to show that she worked for defendant in March 2018.

¶ 20    When asked if defendant was coaching her after mid-February 2018, A.B. responded, "[n]ot through a team, no." She denied that someone named Kale was training her during March 2018. She repeated that defendant was training her during the spring of 2018. She admitted that she and defendant never met and trained in person. She also admitted that the sexual contacts with defendant occurred after defendant was no longer coaching her.

¶ 21    A.B. admitted that at their initial meeting, she never told the investigator that (1) she and defendant had engaged in oral sex, (2) he touched her vagina with his hand, (3) he masturbated her, (4) she and defendant had gotten naked together, or (5) she had gone to defendant's house. She admitted that withholding information from the investigator was the same as lying. She admitted that the only thing she told the investigator initially was that defendant had kissed her after work.

¶ 22    A.B. admitted telling the investigator at her second interview that there were a couple of things that she neglected to reveal during her initial interview and that she had lied during the first

interview. She admitted *telling* the investigator during the second interview that (1) she had gone to defendant's house during spring break and that more touching had occurred, and (2) defendant put his penis in her mouth, but that he never ejaculated. She admitted *not telling* the investigator during the second interview that (1) defendant put his finger in her vagina or masturbated her, or (2) defendant put his mouth on her vagina.

¶ 23    A.B. denied telling anyone, including her therapist, that the sex acts occurred at defendant's office. She admitted that the therapist's notes showed that she told her that the sex acts occurred at defendant's office. She never told her therapist about all of the sex acts between her and defendant. She told her therapist that she and defendant had engaged in oral sex on two occasions, even though previously she had not told anyone else. She never told her therapist, however, that defendant ejaculated in her mouth. She admitted that, even though she told her therapist that defendant had put his finger in her vagina and masturbated her, she did not report that to the investigator. When the investigator asked A.B. if she told the therapist that all the sex acts occurred at defendant's office, A.B. said no. A.B. testified that she still believed that she never told the therapist that.

¶ 24    A.B. admitted that two days before trial she first told the prosecutors that (1) defendant had ejaculated in her mouth and (2) she believed he had done so on two occasions. She admitted that her story had significantly changed between her first investigator meeting and the trial. She further admitted that she intended to file a civil suit against defendant. However, she denied that she had exaggerated her version of the events to enhance her civil suit.

¶ 25    On redirect examination, A.B. testified that she was sure that she and defendant engaged in oral sex on two occasions. She was also sure that defendant had touched her breasts and vagina with his hand.

¶ 26    When asked how she kept track of her work hours during February and March 2018, A.B. answered that defendant told her not to worry about it because he was keeping track. Although unpaid, she would go to work after soccer practice or whenever she had time. Soccer practice would typically end around 4:30 p.m. Depending on her homework, A.B. would work at least a couple of hours a couple of days a week. She would arrive at work around 5 p.m. and leave around 7 or 8 p.m. According to A.B., sexual contacts between her and defendant, other than kissing and possibly touching her butt or breasts through her clothing while at the office, occurred at defendant's house. She clarified that in February and March 2018 defendant was still giving her advice and training tips regarding soccer. She added that she did not talk to anyone other than investigators and her therapist about her relationship with defendant, because she was uncomfortable doing so.

¶ 27    On recross-examination, A.B. admitted that she never asked defendant why she was not getting paid for her work. Nor could she recall the name of any clients whose files she had worked on.

¶ 28    On redirect examination, A.B. testified that she never asked defendant about getting paid because she trusted him. She explained that, even though she told investigators that she had gone to client meetings in March 2018, that was untrue during spring break, because she instead went to defendant's house. According to A.B., defendant told her to tell her parents that she was going to client meetings.

¶ 29    Beth Mullarkey, an investigator at the Kane County Child Advocacy Center, first met with A.B. on April 6, 2018. After obtaining A.B.'s cellphone, Mullarkey was able to review text messages between A.B. and someone identified as "Coach Jon."

¶ 30    After reviewing the text messages, Mullarkey met with defendant on April 9, 2018. When Mullarkey told defendant that she wanted to discuss his relationship with A.B., his demeanor completely changed, and he looked very nervous.

¶ 31    Defendant told Mullarkey that he had been A.B.'s soccer coach for several years and had hired her to work at his accounting firm for about the last year. When she asked defendant about his relationship with A.B. outside of coaching and work, defendant responded that he did not know how it had gotten that far. He admitted that he and A.B. had briefly kissed a couple of weeks earlier. After kissing A.B. at the office, defendant was bothered, lost sleep, and tried to figure out a way to deal with the situation. Defendant told Mullarkey that his children considered A.B. to be like an older sister. He added that he thought of her as a daughter.

¶ 32    Defendant told Mullarkey that he had hired A.B. to do data entry at his firm. He had taken her on a couple of client interviews. He said that A.B. was able to work around her soccer schedule.

¶ 33    When Mullarkey told defendant that she had reviewed text messages between him and A.B., defendant responded that he had sent her some inappropriate text messages.

¶ 34    Defendant also admitted that he and A.B. had gotten together at his house during A.B.'s spring break. His wife and children were visiting family in southern Illinois. A.B. came over to watch a movie. After watching the movie, at some point, their clothes were off. Defendant told Mullarkey that A.B. was completely naked and that he had on only boxer shorts. A.B. then sat on him on the couch and was riding him. When asked, defendant said that he had touched A.B. on her breast and most of her naked body. He told Mullarkey that A.B.'s parents thought she was at work. He added that (1) he and A.B. were naked in the guest bedroom and (2) they had occasionally kissed in his vehicle near his office.

¶ 35    When Mullarkey asked defendant how he felt about the situation, he said that he knew "that he violated the trust of [A.B.'s] family." He wanted to make it right with her family and wondered if he should apologize to her parents.

¶ 36    According to Mullarkey, because the case did not involve a predatory sex offense, she did not record the entire interview. Instead, she audio recorded defendant's summary of what he had said. Mullarkey played the recording for the court.

¶ 37    Based on her interview with defendant, Mullarkey interviewed A.B. a second time. According to Mullarkey, it is typical to interview a victim more than once because the victim is not always ready to disclose information. After a victim gets more comfortable through therapy, they are reinterviewed. After interviewing A.B. a second time, Mullarkey received information from a mandated reporter that something sexual had occurred at defendant's office. She then interviewed A.B. a third time.

¶ 38    On cross-examination, Mullarkey admitted that defendant voluntarily met with her and provided information. He never told her that he had engaged in oral sex or any sexual penetration with A.B. When asked if she had received a report from the Department of Children and Family Services that all of the sexual contacts had occurred at defendant's office, Mullarkey answered that she did not remember the report saying that all of the sexual contacts occurred in the office, but she was aware that some of them had.

¶ 39    When Mullarkey asked A.B. if any of the sexual contacts occurred at defendant's office, A.B. answered that none of it did except kissing. A.B. told Mullarkey that she did not tell her therapist that the sexual contact occurred at the office.

¶ 40    In ruling on defendant's motion for a directed finding, the trial court first considered the evidence as to the sex acts. The court noted major inconsistencies regarding A.B.'s testimony about

oral sex and defendant penetrating her vagina. The court pointed to her different versions reported to the investigator and the prosecutors. The court also noted that A.B. admitted that her version had changed over time. The court found her intention to file a civil suit showed bias and prejudice. The court commented that, as for acts of sexual penetration, as charged in counts I through IV, it thought that something had happened, but it did not know what. The court found A.B. impeached by her inconsistent testimony regarding acts of sexual penetration and her not being entirely forthcoming regarding such acts. Thus, the court granted the motion for a directed finding as to counts I through IV.

¶ 41    As for the acts of sexual abuse alleged in counts V and VI, the trial court found A.B.'s testimony consistent and that she was unimpeached. Defendant's statement to Mullarkey corroborated A.B.'s testimony as to the sexual conduct. Thus, the court found that the State's evidence was sufficient to withstand the motion for a directed finding on counts V and VI.

¶ 42    The trial court then considered whether the evidence showed that defendant was in a position of trust, authority, or supervision when he committed the sexual acts charged in counts V and VI. In doing so, the court gave the terms trust, authority, and supervision their plain and ordinary meaning. The court considered three relationship possibilities: defendant (1) was A.B.'s soccer coach, (2) was her boss, and (3) had a relationship with her family.

¶ 43    As for defendant being A.B.'s soccer coach, the trial court found that, although defendant no longer actively coached A.B. because she was on the high school team, he gave her extra workouts in February and March 2018. The court noted that A.B. also testified that she and defendant would text or phone most days to talk about, among other things, soccer. Because defendant had coached her for so many years, the court found that a trust relationship had developed.

¶ 44 As for defendant being A.B.'s boss, the trial court noted that, after A.B. worked for defendant during the summer of 2017, she and defendant maintained a trust relationship that carried over into 2018.

¶ 45 As for defendant's relationship with A.B.'s family, the trial court pointed to the evidence that A.B. would sit in church with defendant and his family. Her parents allowed her to ride alone with defendant to soccer games and client meetings. The court emphasized that defendant's statement to Mullarkey that he had violated A.B.'s family trust showed that such a relationship existed in defendant's mind.

¶ 46 Based on defendant's position as A.B.'s ex-coach and former boss, and his status as a family friend, the trial court found that A.B. and her family trusted defendant. The court further found that this position of trust created an opportunity for defendant to take advantage of that trust to commit sex acts with A.B. Thus, the court denied the motion for a directed finding as to counts V and VI.

¶ 47 Michelle Tams testified for defendant. Tams was the office manager at defendant's firm. During the summer of 2017, she saw A.B. working at the office. Tams did not know if A.B. was paid for her work. Beginning in January until mid-February 2018, Tams saw A.B. at the office. She did not know what A.B. was working on. According to Tams, she never saw A.B. at the office after mid-February 2018. During that time, Tams would typically be at the office as late as 6 or 7 p.m.

¶ 48 On cross-examination, Tams admitted that she was not responsible for processing checks for A.B. or having A.B.'s hours reported to her. She admitted that it was possible that A.B. had worked in March 2018 and that she just did not see her.

¶ 49    The parties stipulated that when A.B. met with the prosecutors on May 9, 2019, she did not tell them that defendant had ejaculated in her mouth or inserted his fingers in her vagina. At the June 3, 2019, meeting, however, A.B. told the prosecutors that she had performed oral sex on defendant on two occasions during spring break and that he ejaculated in her mouth once.

¶ 50    In ruling, the trial court stood by its earlier analysis of the evidence and its assessment of A.B.'s credibility regarding counts V and VI. The court clarified its comments regarding trust and found that defendant knew that he had A.B.'s and her family's trust. In finding that defendant held a position of trust when the sexual conduct occurred, the court considered the relationship between defendant and A.B. over the years, first as her coach, and then as her boss, combined with his being a family friend. Thus, the court found defendant guilty.

¶ 51    Following the denial of defendant's motion for a new trial, the trial court sentenced him to 40 months' sex offender probation and 270 days' periodic jail time. Defendant then filed this timely appeal.

¶ 52                                    II. ANALYSIS

¶ 53    On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of criminal sexual abuse because the evidence was insufficient to establish that, when he committed the sexual acts, he held a position of trust, authority, or supervision in relation to A.B.

¶ 54    In evaluating the sufficiency of the evidence, it is not the province of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. The weight given the witnesses' testimony, the determination of their credibility, and the reasonable inferences drawn from the evidence are all matters for the trier of

fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. We will set aside a criminal conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of a defendant's guilt. *Smith*, 185 Ill. 2d at 542.

¶ 55    To prove aggravated criminal sexual abuse under section 11-1.60(f) of the Criminal Code of 2012, the State must prove, among other things, that the defendant held "a position of trust, authority, or supervision in relation to the victim." 720 ILCS 5/11-1.60(f) (West 2018). In construing the terms "trust," "authority," and "supervision," Illinois courts give them their common dictionary meanings. *People v. Reynolds*, 294 Ill. App. 3d 58, 65 (1997). The term "trust" is interpreted to mean confidence in the integrity, ability, character, and truth of a person. *People v. Secor*, 279 Ill. App. 3d 389, 396 (1996). In using the word "trust," the legislature intended to prevent sex offenses by those in whom a child would place her trust. *Secor*, 279 Ill. App. 3d at 396. This trust makes the child particularly vulnerable, and betrayal of that trust makes the offense particularly devastating. *Secor*, 279 Ill. App. 3d at 396.

¶ 56    Here, we initially note that the State needed to prove only one of the three alternatives in section 11-1.60(f)—defendant held a position of trust *or* authority *or* supervision when he committed the sexual conduct. Because the evidence established that defendant held a position of trust in relation to A.B., we need not decide whether he also held a position of authority or supervision.

¶ 57    Defendant does not dispute that the sexual conduct occurred during the last week of March 2018. Nor does he contest that he held a position of trust while he coached A.B.'s soccer team and employed her. Rather, he asserts that, because he was not the coach of her soccer team or her

employer when the sexual conduct occurred, he no longer held a position of trust in relation to A.B. We disagree.

¶ 58    As discussed, for purposes of section 11-1.60(f), trust is defined as having confidence in the integrity, ability, character, and truth of a person. *Secor*, 279 Ill. App. 3d at 396. Although defendant had stopped coaching A.B.'s soccer team in early 2018, he had coached her since she was in the sixth grade. During that time, A.B. developed a confidence in defendant's integrity, ability, character, and truth. Indeed, she rode alone to games with defendant. When she worked for defendant during the summer of 2017, she rode alone with him to client meetings. That she would spend time alone with defendant evinced her confidence in his integrity and character. Before January 2018, she communicated with defendant almost daily about such things as soccer, his children, church, and work. She testified that she looked up to him as her coach and boss and considered him a second father.[1] Further, she undoubtedly had come to trust his ability as a soccer coach, as she continued to rely on his training and advice throughout the spring of 2018, including the last week of March. Clearly, by the early spring of 2018, even though defendant had stopped

---

[1] We note that defendant argues that A.B. lacked credibility. Although, in entering a directed finding for defendant on counts I through IV, the trial court found A.B. had been impeached and that her testimony related to the sex acts charged in counts I through IV was inconsistent, the court found that her testimony regarding the sex acts charged in counts V and VI was consistent and unimpeached. The trial court was in the best position to assess A.B.'s credibility and to resolve any inconsistencies therein. See *Smith*, 185 Ill. 2d at 542. Our review of the record shows no basis for disturbing the trial court's credibility determination.

coaching her soccer team and even though she might have no longer worked for defendant, A.B. had come to place a great deal of trust in defendant.

¶ 59    Further, we note the trust that A.B.'s family placed in defendant. Although the trust relationship must exist between the offender and the victim (see 720 ILCS 5/11-1.60(f) (West 2018)), the trust that A.B.'s family had toward defendant circumstantially showed that A.B. trusted defendant. Her parents had allowed A.B., beginning as early as the sixth grade, to ride alone with defendant to soccer games. Later, they allowed her to ride alone with defendant to client meetings. Allowing their daughter to be alone with defendant exhibited a high degree of confidence in defendant's integrity and character. Additionally, defendant attended the same church as A.B.'s family, and her parents allowed her to sit during services with defendant and his family, as opposed to her own family. Further, defendant admitted to the investigator that he had violated the trust of A.B.'s family. The trust that A.B.'s parents had in defendant, which would have been apparent to A.B., is further evidence that A.B., their child, also trusted defendant.

¶ 60    More importantly, such a strong trust relationship did not suddenly evaporate merely because defendant no longer coached A.B.'s soccer team or employed her. Indeed, it was only a matter of a month or so after he ceased coaching her soccer team that defendant committed the sexual conduct. Absent some indication that the trust relationship that existed in February 2018 was otherwise weakened or destroyed, it certainly could continue to exist to the last week of March 2018.

¶ 61    Defendant asserts that there must be an end to any trust relationship and that it cannot last forever. While that may be true, we need not decide that question as propounded here. The sexual conduct occurred only a brief time after the formal coaching relationship ended. As noted, there

was no indication that anything beyond the mere passage of time could have weakened, let alone ended, A.B.'s trust in defendant.

¶ 62    The trust relationship that existed in early 2018 continued after defendant stopped coaching A.B.'s soccer team. There was additional evidence that A.B. continued to trust the defendant during the last week of March 2018. During that time, she continued to talk to defendant about her high school soccer. Defendant provided her with extra workouts designed to prepare her for playing college soccer. A.B. would let defendant know when she completed the workouts, and he would then provide her with additional workout advice. She also would send him photographs of her body to show her workout progress. A.B., who was indubitably serious about soccer, continued to trust defendant in that regard.

¶ 63    There was still other evidence that, in late March 2018, A.B. continued to trust defendant. She would sit in church with defendant and his family instead of sitting with her own family or friends. She also testified that, when the sexual conduct occurred, she did not feel like she could say no, because she had known defendant for a long time and trusted him. Further, during the last week of March, A.B. went alone to defendant's home even though his wife and children were out of town. Clearly, A.B. was continuing to trust defendant as of late March 2018 when the sexual conduct occurred.

¶ 64    Viewed in the light most favorable to the State, there was ample evidence that, when the sexual acts occurred, defendant held a position of trust in relation to A.B. Thus, the State proved defendant guilty beyond a reasonable doubt of aggravated criminal sexual abuse.

¶ 65                                III. CONCLUSION

¶ 66    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 67    Affirmed.

**No. 2-19-0862**

| | |
|---|---|
| **Cite as:** | *People v. Miki*, 2020 IL App (2d) 190862 |
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 18-CF-2840; the Hon. Jeffrey S. MacKay, Judge, presiding. |
| **Attorneys for Appellant:** | Terry A. Ekl and Kevin A. Halverson, of Ekl, Williams & Provenzale LLC, of Lisle, for appellant. |
| **Attorneys for Appellee:** | Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Amy M. Watroba, Assistant State's Attorneys, of counsel), for the People. |