2023 IL App (4th) 220947
NO. 4-22-0947

FILED
June 29, 2023
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Mercer County |
| ROBERT W. BRESHEARS JR., | ) | No. 20CF72 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Norma Kauzlarich, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Lannerd and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1       Following a trial in the circuit court of Mercer County, a jury found defendant,

Robert W. Breshears Jr., guilty of four counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(4)

(West 2020)). The trial court sentenced defendant to a total of eight years in prison on two of those

counts. Defendant appeals, challenging the sufficiency of the evidence and whether the court was

impartial. We affirm.

¶ 2                               I. BACKGROUND

¶ 3       Defendant turned 50 years old in March 2020. Between February and May 2020,

defendant had a sexual relationship with 17-year-old E.K. The State charged defendant with four

counts of criminal sexual assault under the theory that he held a position of authority or supervision

in relation to E.K., "being the owner and coach at No Fears [*sic*] Dojo." Counts I and II alleged

defendant placed his penis in E.K.'s vagina on or about February 17, 2020. Counts III and IV

alleged defendant engaged in that same conduct on or about May 1, 2020, through May 12, 2020. Counts I and III alleged defendant held a position of authority in relation to E.K., whereas counts II and IV alleged he held a position of supervision.

¶ 4 The disputed issues at trial were whether defendant (1) held a position of authority or supervision in relation to E.K. and (2) knew E.K. was under 18 years old. The following is a summary of the evidence most relevant to this appeal.

¶ 5 A. The Evidence

¶ 6 Defendant worked for the Village of Sherrard (Village). While continuing that employment, in fall 2019, defendant opened a martial arts gym called No Fear Dojo with his wife, Christine. Shortly after the dojo opened, E.K. and her sister, G.K., joined at the behest of their father, J.K. J.K. previously knew defendant from defendant's work with the Village. According to J.K., defendant told him he was opening the dojo and that J.K.'s daughters needed to be taught self-defense. J.K. agreed, and he paid E.K.'s and G.K.'s membership fees at the dojo. J.K. also joined the dojo for a couple of months, and he would attend classes when he was not working. E.K. listed her age on her membership application. Defendant testified he knew E.K. was "significantly younger" than he was, but he denied knowing her exact age.

¶ 7 The dojo offered classes for both children and adults. Although E.K. was a 17-year-old high school student and G.K. was 14 years old, they both took adult classes at the dojo. This included kickboxing on Mondays, Wednesdays, and Fridays and jiujitsu on Tuesdays and Thursdays. Defendant was their instructor.

¶ 8 E.K.'s and G.K.'s classes started at 5 p.m. and lasted one hour. Class sizes were small—between 4 and 10 participants. Although E.K. and G.K. were novices, at least one class participant had extensive competitive martial arts experience. Participants would bow to defendant

before commencing exercises and at the end of classes. Some witnesses suggested this practice signified respect toward the martial arts, not a sign of defendant's authority as the instructor. However, defendant acknowledged that part of the ritual of some martial arts disciplines is to begin class by bowing both to the instructor and to the mats.

¶ 9 The evidence showed defendant directed the content of the classes he instructed. However, witnesses agreed defendant could not force participants to attend classes or to follow his instructions. Most participants, including E.K., called defendant "Bob," though some children called him "coach." E.K. testified that defendant supervised group work during classes.

¶ 10 According to defendant, E.K. was "uncontrollable" during classes. He was "unable to reign her in," and he felt "uncomfortable teaching her." Defendant described E.K. as "[v]ery playful," "[v]ery disruptive," and "[v]ery flirtatious" with men at the dojo. Defendant testified that he asked E.K. to pay attention during class and to stop being disruptive. At one point, defendant arranged for an acquaintance of his, Kimberly Woods, to help him instruct E.K. in jiujitsu. Woods acknowledged that her duties at the dojo were "to oversee and evaluate." Notwithstanding the additional instruction from Woods, it appeared to defendant that E.K. remained playful in classes.

¶ 11 The defense called multiple witnesses who observed E.K. acting inappropriately around the dojo, such as by "groping" or "hanging on" men and writing love notes to defendant. At a party at the dojo for defendant's fiftieth birthday, one witness heard E.K. say, "I'm 18. I can do what I want." E.K. testified she did not make that comment. One of defendant's witnesses recalled E.K. asking her whether she thought defendant would ever leave or cheat on Christine.

¶ 12 Christine likewise testified that E.K. was "desperate" for male attention and was sometimes inappropriate during their conversations. Nevertheless, E.K. and Christine soon grew

very close. Christine described having a familial or best friend relationship with E.K. Christine testified that she and E.K. would say "I love you" to each other.

¶ 13        E.K. also grew very close with defendant. E.K. acknowledged having a flirtatious relationship with him and that they would exchange text messages. Before long, E.K. and G.K. would exercise at the dojo before their classes, stay at the dojo after classes, and have dinner with defendant and Christine when J.K. was working. (As a firefighter, J.K. worked 24-hour and sometimes 48-hour shifts.)

¶ 14        Defendant gave E.K. a key to the dojo. She would go there at all hours, including when nobody else was there. The dojo was not a 24-hour gym, and other members did not have keys or the same access to the facilities that E.K. had. Defendant testified he gave E.K. a key because she texted him constantly seeking access to the dojo to exercise. According to defendant, he told E.K. to exercise when he was not present, yet she continued to show up at the dojo when he was there. E.K., on the other hand, testified that defendant would stop in when she exercised.

¶ 15        Defendant operated a snowplow as part of his employment with the Village. G.K. and E.K. both testified about going on a snowplow ride with defendant in January or February 2020. G.K. recalled feeling uncomfortable during the ride when defendant made a comment to the effect that E.K. had a "big butt." According to E.K., defendant offered her alcohol that night back at the dojo. Later, defendant took off all his clothes and wanted her to remove hers. E.K. testified that she felt uncomfortable doing so, but defendant insisted. E.K. took off her shirt, and defendant pulled down her bra before she covered herself. E.K. testified she did not return home until around 3 a.m.

¶ 16        E.K. continued to frequent the dojo after the night of the snowplow ride, and she developed a physical relationship with defendant. According to E.K., one evening before class,

defendant "cornered" her in the kitchen of the facility. He then stuck his hand down her shorts, pulled down his own shorts, and masturbated until he ejaculated. E.K. acknowledged not having told detectives some of those details prior to trial.

¶ 17       Defendant and E.K. first had sexual intercourse in mid-February 2020. They offered different accounts of what transpired. Defendant testified that E.K. removed her clothing, "threw herself" at him, and he "gave in." E.K., on the other hand, recalled that defendant asked her to come to the dojo on February 17, 2020, to help clean the facility. E.K. testified that defendant digitally penetrated her vagina while she lay on the mats. At some point, she felt "an extremely sharp pain." Although her eyes were closed, she felt something in her vagina that was "different than [defendant's] fingers." E.K. had never had intercourse before, and she noticed she was bleeding when defendant got off her. E.K. then heard defendant say, "I swore I was going to wait until you were 18." At trial, defendant denied making such a remark.

¶ 18       E.K. testified that she and defendant continued to have intercourse "almost every weekday" thereafter. According to E.K., defendant wanted sex before he went to work in the mornings, on lunch breaks, or before martial arts classes began in the evenings. E.K. related that she was "very scared as to what would happen" to her if she did not continue to have sex with defendant. To that end, she explained that on days when she would go to the dojo before class started, he would use jiujitsu against her until she was unable to fight back, and she "just let him do whatever he wanted." E.K. testified that there were days "towards the end in the summer" when she did not go to the dojo. Based on what she felt and defendant's comments to her, E.K. claimed defendant would make classes harder for her when she did not have sex with him. From mid-March to June 2020, the dojo did not hold classes due to the COVID-19 pandemic. However, defendant allowed E.K. and G.K. to work out at the dojo during that time. E.K. testified that her sexual

relationship with defendant stopped on May 13, 2020—her eighteenth birthday—when she went to confession and decided she "wasn't going to allow what was happening to happen anymore."

¶ 19      Defendant introduced witnesses who either observed or participated in classes. Those witnesses did not perceive defendant making classes harder on E.K. than on other participants. Defendant testified that he, not E.K., broke off their sexual relationship on May 15, 2020.

¶ 20      Shortly after defendant and E.K. stopped their sexual relationship, E.K. had a positive pregnancy test. In June 2020, she miscarried. Defendant and E.K. continued to communicate. E.K. testified defendant reached out to her constantly, wanting to know what she was doing and how she was doing. E.K. testified she would go to the dojo at that point only with G.K. G.K. was gone for a portion of the summer of 2020, during which time E.K. did not attend the dojo. E.K. returned to the dojo in late July or early August 2020.

¶ 21      E.K. testified that in August 2020, she found a handwritten note from defendant in her kickboxing glove. Defendant admitted writing the note but denied giving it to E.K. According to defendant, the last time he saw that note was in a desk drawer in his office. The trial court admitted the note into evidence. In the note, defendant explained that he originally viewed E.K. as "a mature young woman" rather than an "innocent[,] confused young girl." He viewed their relationship as a reciprocal "affair," insofar as they agreed there would be "no emotional feelings" between them. Defendant related that E.K. assured him she was "fine with that." Defendant explained that, despite those original intentions, he fell in love with E.K. and had to stop the relationship. Defendant acknowledged what he did was wrong. He now recognized that E.K. was "a scared[,] confused little girl looking for approval." Defendant regretted cheating on his wife, and he recognized he "completely tore apart the life of a beautiful[,] innocent young woman's life

[*sic*] for some self[-]pleasure." Defendant closed the letter by apologizing to E.K. and expressing hope she would forgive him.

¶ 22 Not long after E.K. read that letter, both Christine and J.K. learned of the sexual relationship between E.K. and defendant. J.K. contacted the police. As part of the investigation, the police found nonsexual photographs of E.K. on defendant's Village-issued phone.

¶ 23 B. Verdict

¶ 24 During deliberations, the jury asked for definitions of "authority" and "supervision." The trial court informed the jury that "authority" means "the power to command, enforce laws, exact obedience, or judge." The court informed the jury that "supervision" means "[t]he action of supervising someone or something; the act of overseeing."

¶ 25 The jury found defendant guilty of all four charges. The trial court merged count II into count I and merged count IV into count III.

¶ 26 C. Sentencing

¶ 27 At the sentencing hearing, E.K. provided a lengthy and highly emotional victim impact statement. She excoriated defendant and detailed how his conduct led her down an extremely dark path. As part of her statement, E.K. expressed dismay that defendant had "more rights" and "more protection throughout this entire case" than she had. She criticized the defense for "play[ing] games" to delay the trial while defendant was on bond. In E.K.'s view, she learned through this experience that "what we call the 'justice system' doesn't care how the victims are affected."

¶ 28 The minimum sentence defendant faced was four years in prison on both counts, to be served consecutively. The defense requested the minimum sentence, whereas the prosecutor requested "at least" the minimum.

¶ 29    Recognizing that the parties were "not arguing as to the sentence," the trial court imposed the minimum sentence. Rather than providing a rationale for the sentence, the court addressed E.K. directly:

> "[THE COURT]: You are absolutely correct that the laws of our country protect the criminal rather than the victim, unfortunately. If you look back and see the people that came over from England, they were the throwaways that, you know, ne'er-do-wells, or the criminals from England that they didn't want. So when they developed our Constitution—which is the document we are supposed to live by—all rights and protections are for criminals. It doesn't make it right, but at the end of the day that's the document we all live by.
>
> You read a very long victim impact statement and I picked out from there and heard the word about 'destroying'. I can't speak as to that situation that, unfortunately, will form you as a person. I lived for 18 years in a domestic violence home because I was too embarrassed to speak up because I was 'aware', and I look back now and I don't know that I would change that. I know that sounds weird, but that unfortunate experience led me to the person I am today. I get called 'bitch' a lot. Hmm. Really. It doesn't bother me. I got called that this morning. I think I got called a 'super effing bitch.'
>
> Did I not? Yeah.
>
> So I—in times past I probably would have melted and, 'Oh, my God.' And now I'm like, 'Hey, come back.' I used to tell the Defendants to engrave it on a bracelet for me.

So you get to define your future no matter your past and even if it was horrible. And I heard guffaws and sighing and everything from over here (indicating) which was disrespectful, but that's her reality. And the disrespect from this side (indicating) to a woman that is living that reality from someone that should have known better because he was the adult in this situation is appalling to me. Because we teach our girls to put up with it and do what everybody—every man wants.

I love my current husband, but I told him that after him, I'm done.

I am not minimizing your unfortunate life event, but you can use it to create something bigger and I always think that things happen for a reason. I'm not saying it should have happened. What I'm saying is if it did happen, you use it for better, to be a better and bigger person than this. (Indicating.)"

¶ 30    Defendant did not file a postsentencing motion. He filed a timely notice of appeal.

¶ 31                                II. ANALYSIS

¶ 32                        A. Sufficiency of the Evidence

¶ 33    Defendant first challenges the sufficiency of the evidence.

¶ 34    "When presented with a challenge to the sufficiency of the evidence, the relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *People v. Secor*, 279 Ill. App. 3d 389, 394 (1996). We may not substitute our judgment for the jury's judgment on matters pertaining to weighing evidence or determining witness credibility. *People v. Kaminski*, 246 Ill. App. 3d 77, 82 (1993). "We will set aside a criminal conviction only where the evidence is so unreasonable, improbable, or

unsatisfactory as to justify a reasonable doubt of a defendant's guilt." *People v. Miki*, 2020 IL App (2d) 190862, ¶ 54.

¶ 35        Section 11-1.20(a)(4) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.20(a)(4) (West 2020)) provides that a person commits criminal sexual assault if that person commits an act of sexual penetration and "is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim, and the victim is at least 13 years of age but under 18 years of age." Defendant does not dispute that he committed acts of sexual penetration with E.K. when he was an adult and she was 17. Defendant solely challenges the evidence as to his status in relation to E.K.

¶ 36        The statutory language "trust, authority, or supervision" is in the disjunctive. Thus, courts will uphold a conviction if the evidence shows that the defendant's relationship with the alleged victim implicated any of those three categories. *Miki*, 2020 IL App (2d) 190862, ¶ 56. Here, the State charged authority and supervision, and the trial court sentenced defendant on two counts alleging authority (counts I and III). Accordingly, we will focus on whether the State proved defendant held a position of authority in relation to E.K. We note defendant asserts that the definition of "supervision" the court gave the jury was not as "comprehensive" as what case law provides. However, because the court did not sentence defendant on the counts alleging supervision, we need not address that issue.

¶ 37        Section 11-1.20 of the Code does not define "authority," but courts have given that word its common dictionary meaning. *People v. Reynolds*, 294 Ill. App. 3d 58, 65 (1997). " 'Authority' is '[t]he power to command, enforce laws, exact obedience, determine, or judge.' " *Secor*, 279 Ill. App. 3d at 396 (quoting American Heritage Dictionary 142 (2d coll. ed. 1985)). Here, the trial court provided this definition of authority to the jury.

¶ 38      We hold that the jury rationally found defendant held a position of authority in relation to E.K. The evidence established that defendant controlled martial arts instruction at his dojo by, among other things, determining which activities participants would engage in during classes. There was also evidence that participants bowed to defendant, which the jury reasonably could have inferred was indicative of respect toward him and his authority. See *Reynolds*, 294 Ill. App. 3d at 66 ("When more than one inference may be drawn, the question is one of fact for the jury."). Defendant gave E.K. a key and unrestricted access to the dojo, thereby encouraging her to frequent the gym and creating the circumstances for a sexual relationship to develop. Moreover, E.K. testified that she was very scared as to what would happen to her if she did not continue having sex with defendant. She described defendant using jiujitsu against her before classes to the point she was unable to fight anymore, and she "just let him do whatever he wanted." E.K. further testified that defendant made classes harder on her when she did not have sex with him. We recognize there was conflicting evidence on that point, but it was within the jury's province to resolve that conflict. *Miki*, 2020 IL App (2d) 190862, ¶ 54.

¶ 39      Defendant's own testimony likewise suggested he held a position of authority in relation to E.K. He testified that he asked E.K. to pay attention during class and to stop being disruptive, which is something one might expect an authority figure to say. Defendant further testified that he solicited help from Woods when he discerned that E.K. was "uncontrollable." The jury reasonably could have found that defendant demonstrated his authority when he took steps to address E.K.'s behaviors.

¶ 40      Defendant proposes the evidence showed that "E.K. was anything but amenable to the authority or supervision of [defendant] or anyone else." Defendant cites evidence that E.K. behaved inappropriately around the dojo, including toward men. Defendant's arguments do not

change our analysis. The statute required the State to prove defendant held a position of authority in relation to E.K. 720 ILCS 5/11-1.20(a)(4) (West 2020). Defendant cites no case indicating that the State also had to prove E.K. was amenable to defendant's authority. To the contrary, the appellate court has said the statute does not even require an alleged victim to be aware of the defendant's authority in relation to her. *People v. Grocesley*, 384 Ill. App. 3d 682, 686 (2008). Defendant essentially asks us to read an additional element into the statute, which is something we cannot do. See *In re Andrew B.*, 237 Ill. 2d 340, 352 (2010) (noting that a court may not read into a statute "additional elements not intended by the legislature"). If defendant were correct that the State must prove that a victim is amenable to authority, a high school teacher could have a sexual relationship with a 17-year-old student and it would be a defense to criminal charges if the student was unruly. We deem it highly unlikely the legislature intended that result.

¶ 41        Defendant's testimony showed he recognized E.K.'s relative youth and immaturity, yet he gave her unrestricted access to his dojo and commenced a sexual relationship with her. The jury was not required to view E.K.'s inappropriate conduct around the dojo as a defense to the criminal charges. Instead, the jury reasonably could have determined defendant used his opportunity as a martial arts instructor to exploit E.K.'s immaturity and vulnerability. To that end, section 11-1.20(a)(4) of the Code applies where "a defendant's position of trust, authority or supervision in relation to a victim provides access and opportunity for an offense to occur." *Grocesley*, 384 Ill. App. 3d at 686.

¶ 42        Defendant emphasizes that he was a business owner rather than a school official. He notes he could not force members to join the dojo, to attend classes, or to follow his directions. Defendant also proposes that he was not a "coach," noting the absence of evidence that his students engaged in martial arts competitively.

¶ 43    Notwithstanding defendant's arguments, case law indicates that a business owner may come within the scope of section 11-1.20(a)(4) of the Code. In *People v. Grano*, 286 Ill. App. 3d 278, 281, 293 (1996), the State charged the defendant, who owned a karate school and was the head instructor, with violating the "supervision" prong of the statutory predecessor to section 11-1.20(a)(4) of the Code. The evidence showed that K.M. started attending the karate school when she was six years old, and the defendant was her instructor. *Grano*, 286 Ill. App. 3d at 281. Sometime in 1993, when K.M. was about 14 years old, she became an instructor at the school but continued to attend classes. *Grano*, 286 Ill. App. 3d at 281, 283. From summer 1993 until early 1994, the defendant and K.M. engaged in a physical relationship that progressed into sexual activity. *Grano*, 286 Ill. App. 3d at 281-82. The jury found the defendant guilty of criminal sexual assault. *Grano*, 286 Ill. App. 3d at 284. Although the appellate court reversed and remanded for a new trial based on an evidentiary error, the court (1) determined the evidence was sufficient to sustain the conviction and (2) held that the statute was not unconstitutionally vague as it applied to the defendant. *Grano*, 286 Ill. App. 3d at 289-90, 292-93. Thus, there is precedent for applying section 11-1.20(a)(4) of the Code to a business owner such as a martial arts instructor.

¶ 44    Moreover, in his role as E.K.'s instructor, defendant arguably acted as a coach. A coaching relationship may fall within the scope of section 11-1.20(a)(4) of the Code. See *Secor*, 279 Ill. App. 3d at 396 ("It is evident that, in enacting [the statutory predecessor to section 11-1.20(a)(4) of the Code], the legislature sought to prevent sex offenses by those whom a child would tend to obey, such as a teacher or coach ***."); *Grocesley*, 384 Ill. App. 3d at 686-87 (upholding the conviction of a high school boys' track coach who had a sexual relationship with a female student in the same school district). The dictionary defines "coach" as "a private tutor" or "one who instructs or trains," especially "one who instructs players in the fundamentals of a sport

and directs team strategy." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/coach (last visited June 21, 2023) [https://perma.cc/7H4S-XZZP]. Although E.K. never entered martial arts competitions, a rational jury could have determined defendant was a coach. To that end, defendant provided martial arts instruction and training to participants at the dojo. At least one participant defendant instructed had extensive prior competitive martial arts experience. There was also evidence that some participants—the younger children—called defendant "coach."

¶ 45    Defendant separately argues we must reverse his conviction on count III, which alleged sexual activity from May 1 through 12, 2020. Defendant reasons that he "could not have been a coach ***, authority figure, or supervisor at the gym when it was closed and no classes were occurring."

¶ 46    The evidence showed that E.K. began a sexual relationship with defendant in February 2020, at which time she was attending classes at the dojo daily. From mid-March to June 2020, defendant held no classes due to the onset of COVID-19. However, during that time, defendant allowed E.K. to exercise at the dojo, and they continued their sexual relationship until mid-May. When the dojo reopened for classes in June 2020, E.K. attended the dojo sporadically. Under these circumstances, a rational jury could have determined that the nature of defendant's relationship with E.K. did not change merely because COVID-19 temporarily halted formal instruction. By analogy, it would be absurd to conclude that a teacher may not be convicted of a crime for continuing a sexual relationship with a 17-year-old student during a school break. We likewise are unwilling to say, as a matter of law, that the impact of COVID-19 immediately terminated defendant's position of authority in relation to E.K. This was an issue for the jury's determination upon consideration of the totality of the evidence.

¶ 47       The court in *Miki* rejected an argument similar to the one defendant raises, albeit in the context of addressing the "trust" component of section 11-1.20(a)(4) of the Code. In that case, the court explained that "a strong trust relationship did not suddenly evaporate merely because defendant no longer coached [the victim's] soccer team or employed her" when they had a sexual relationship. *Miki*, 2020 IL App (2d) 190862, ¶ 60. The court acknowledged that it "may be true" that a trust relationship does not continue forever. *Miki*, 2020 IL App (2d) 190862, ¶ 61. However, the court emphasized that (1) the defendant engaged in sexual activity with the victim "only a brief time after the formal coaching relationship ended" and (2) "there was no indication that anything beyond the mere passage of time could have weakened, let alone ended, [the victim's] trust in defendant." *Miki*, 2020 IL App (2d) 190862, ¶ 61.

¶ 48       Here, defendant and E.K. began their sexual relationship when he was her instructor or coach. The conduct alleged in count III was only a month and a half to two months after defendant temporarily halted classes at the dojo. Importantly, there is no indication in the record that the nature of defendant's relationship with E.K. changed between mid-March and May 12, 2020. Indeed, defendant had given E.K. a key to the dojo, and he continued to allow her to access the facilities despite the impact of COVID-19. Accordingly, a rational jury could have determined that defendant was guilty of the offense alleged in count III.

¶ 49                          B. The Trial Court's Partiality

¶ 50       Defendant next focuses on the trial court's comments to E.K. at the sentencing hearing. According to defendant, the comments "made it clear that because of [the court's] personal experiences and resultant beliefs, [the court] was incapable of being impartial in the present case." Specifically, defendant argues the court's comments revealed "a general disdain for criminal defendants, the willingness to rely on personal experiences as somehow being relevant to

this case, and negative viewpoints about men." Defendant maintains that the court's stated biases "were directly on point" with him, as he was a male criminal defendant and the victim was female. Defendant proposes the court "could have disclosed her personal experiences and resultant attitudes to the parties prior to trial, which would have given them an opportunity to move for substitution or recusal."

¶ 51 Defendant recognizes he failed to raise this issue below, thus forfeiting the matter for review. However, he maintains we should overlook the forfeiture, given that he is objecting to the trial court's conduct. Alternatively, defendant invokes the plain-error doctrine.

¶ 52 The State responds that "the trial court remained impartial" throughout the proceedings. The State notes that defendant did not file any motion challenging the court's partiality, such as a motion for substitution of judge for cause. The State further contends the subject comments were "simply an attempt by the court to assuage" E.K.'s emotional injuries. The State observes that "defendant fails to point to a single instance in this record which demonstrates the court may have ruled or acted inappropriately."

¶ 53 In his rely brief, defendant asserts that "the issue of substitution of judge is not directly at hand ***, although it could have been had the judge revealed her biases at the outset of the case." For the same reason, defendant maintains there is no issue on appeal about forcing the trial court's recusal. Defendant also acknowledges there is no issue about the fairness of his sentence, as the court imposed the sentence each party requested. Rather, defendant frames the issue as "what an appellate court should do when a trial judge reveals at the end of a trial (during sentencing) her personal biases, from her personal experiences, toward a litigant in front of her." According to defendant, this issue "involves consideration of whether the judge should have recused herself much earlier; or should have at least disclosed those biases to the parties so that

they could consider the issue of a motion for substitution." Defendant submits that "[b]ecause the judge did not reveal her biases prior to trial, there is no way to fully determine how her rulings before and during trial were affected."

¶ 54    Defendant did not contemporaneously object to the subject comments, nor did he raise the issue in a postsentencing motion. Thus, defendant forfeited his arguments. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required.").

¶ 55    Defendant cites *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 60, for the proposition that forfeiture applies less rigidly where a trial judge's conduct forms the basis for an objection. However, *Lopez* also says that forfeiture should be relaxed " 'only in extraordinary circumstances, *** such as when a judge makes inappropriate remarks to a jury or relies on social commentary instead of evidence in imposing a death sentence.' " *Lopez*, 2012 IL App (1st) 101395, ¶ 60 (quoting *People v. Thompson*, 238 Ill. 2d 598, 612 (2010)). Nothing of that nature occurred here. Accordingly, we will evaluate defendant's contentions pursuant to the plain-error doctrine.

¶ 56    "To prevail under the plain error doctrine, the defendant must first demonstrate a clear and obvious error occurred." *People v. Galarza*, 2023 IL 127678, ¶ 45. If there was a clear or obvious error, then the reviewing court will reverse if either

> "(1) 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error' or (2) the 'error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the

evidence.' " *Galarza*, 2023 IL 127678, ¶ 45 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 57        Defendant cites cases where reviewing courts reversed criminal convictions due to judicial partiality. Each involved a bench trial where the court demonstrated bias against the defense during trial. Specifically, in *People v. Kennedy*, 191 Ill. App. 3d 86, 91 (1989), the trial court labeled the defense witnesses "thieves, drug addicts, fornicators and welfare recipients" even though there was no evidence supporting such conclusions. In *People v. McDaniels*, 144 Ill. App. 3d 459, 462 (1986), the trial court called the defendant's affirmative defense " 'pretty ridiculous' " before the court had even heard the defendant's evidence. In *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997), the trial court repeatedly made derogatory remarks directed against the Chinese-speaking defendant and her counsel. In *People v. Heiman*, 286 Ill. App. 3d 102, 112 (1996), the trial court made "sarcastic comments" during the defendant's expert's testimony, made "excessive and exaggerated derogatory comments about defendant during the defense's closing argument," and interrupted defense counsel's closing argument at least 40 times. Those cases bear no resemblance to the case at bar, which involved a jury trial. Here, the court never made any comment during trial—let alone in front of the jury—that even arguably could support a claim of judicial partiality. Having carefully reviewed the record, it is clear the court held a trial that was fair to both sides.

¶ 58        At the sentencing hearing, the trial court made the comments that defendant challenges. It is important to consider the remarks in context. E.K. provided a lengthy and highly emotional victim impact statement. From the court's remarks, it seems some of defendant's supporters in the courtroom laughed, sighed, and showed disrespect toward E.K. as she spoke. The parties then agreed that defendant should receive the statutory minimum sentence. To soften the

blow to E.K. before imposing the minimum sentence on defendant, the court addressed E.K. personally.

¶ 59        The trial court began its remarks by validating E.K.'s feeling that defendant had more rights in these proceedings than she did. The court observed it was "unfortunate[ ]" that our laws protect accused criminals, not victims. The court described the country's founders as "throwaways," "ne'er-do-wells," and "criminals from England that they didn't want." Referring to the constitution, the court then said, "It doesn't make it right, but at the end of the day that's the document we all live by." Defendant maintains these comments showed "a general disdain for criminal defendants." We disagree. Perhaps these were things the court should not have said or could have explained in a different way. However, the comments do not suggest any bias against criminal defendants, let alone this defendant.

¶ 60        In a similar vein, the trial court attempted to relate to and encourage E.K. by mentioning that the court had overcome adversity. The court shared that she grew up in a home with domestic violence. The court explained how that "unfortunate experience" formed her as an adult with thick skin to brush off when people call her names. The court told E.K., "So you get to define your future no matter your past and even if it was horrible." Defendant asserts that these comments were improper because they showed a "willingness to rely on personal experiences as somehow being relevant to this case." We see no indication of partiality in these remarks. The court never claimed to have personal experience that was relevant to the case, and this case does not involve domestic violence. The court attempted to relate to E.K. and to encourage her. With that said, the court's use of profanity was unnecessary and demeaning to the atmosphere of a courtroom and the administration of justice.

¶ 61         The trial court then noted the disrespect defendant's supporters had shown toward E.K. during her victim impact statement. The court characterized such disrespect as "appalling" because E.K. was living the reality she described and defendant "should have known better because he was the adult in this situation." We determine these were fair comments in light of the trial evidence and the apparent disrespect shown by defendant's supporters.

¶ 62         The trial court added, "Because we teach our girls to put up with it and do what everybody—every man wants. I love my current husband, but I told him that after him, I'm done." Defendant contends these comments evinced "negative viewpoints about men." It is not apparent why the court referenced her own marriage or what point the court was trying to make by doing so. However, to the extent defendant suggests these comments show that the court could not be impartial in criminal cases involving men, that argument is unpersuasive.

¶ 63         Finally, in a portion of the trial court's remarks that defendant omits from his brief, the court told E.K.:

> "I am not minimizing your unfortunate life event, but you can use it to create something bigger and I always think that things happen for a reason. I'm not saying it should have happened. What I'm saying is if it did happen, you use it for better, to be a better and bigger person than this. (Indicating.)"

Again, the court appeared to be trying to comfort and inspire E.K.

¶ 64         We hold defendant has not demonstrated a clear or obvious error. The trial court's comments—though inartful, confusing at times, and indecorous—were obviously well-intentioned. We see no hint of partiality. Again, we emphasize that defendant's trial was fair and the court imposed the statutory minimum sentence.

¶ 65                              III. CONCLUSION

¶ 66     For the reasons stated, we affirm the trial court's judgment.

¶ 67     Affirmed.

*People v. Breshears*, 2023 IL App (4th) 220947

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Mercer County, No. 20-CF-72; the Hon. Norma Kauzlarich, Judge, presiding. |
| **Attorneys for Appellant:** | John J. Hanlon, of Hanlon Law Office, LLC, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Grace A. Simpson, State's Attorney, of Aledo (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |