2023 IL App (2d) 220374-U
No. 2-22-0374
Order filed December 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07-CF-1763 |
| JAMES W. TURUC, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court properly denied, following a third-stage hearing, defendant's postconviction claim that trial counsel was ineffective for failing to seek dismissal of a charge of criminal sexual assault because a sheriff's detective falsely testified to the grand jury that the victim, a teenage runaway, had lived at defendant's substance abuse recovery home after the victim reached out to him. There was no prejudice from the false statement because there was other evidence to satisfy the element that defendant held a position of trust as to the victim—*i.e.*, the detective's testimony that the victim sought help from defendant, whom the victim believed was a substance abuse counselor, and that they spent two days together and stayed at a motel.

¶ 2    Defendant, James W. Turuc, appeals from a judgment, entered after an evidentiary hearing,

denying his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1

*et seq.* (West 2020)). Defendant contends that he proved that his trial counsel was ineffective for failing to move to dismiss a charge—of which he was later convicted—based on false testimony presented to the grand jury. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4     On June 27, 2007, the State filed a four-count indictment against defendant. Counts I and II both alleged criminal sexual assault in violation of section 12-13(a)(4) of the Criminal Code of 1961 (720 ILCS 5/12/-13(a)(4) (West 2006)). Count I alleged that defendant, "on or about April 16, 2007[,] through April 17, 2007," placed his penis in K.P.'s mouth, while defendant was 45 years old, K.P. was at least 13 years old but less than 18 years old, and defendant "held, as a substance abuse treatment counselor, a position of trust in relation to [K.P]." Count II was identical to count I except that it alleged that defendant placed his penis into K.P.'s anus. Counts III and IV charged aggravated criminal sexual abuse (*id.* § 12-16(d)) based on the acts alleged, respectively, in counts I and II, but without alleging a position of trust.

¶ 5     On August 7, 2007, defendant moved to dismiss counts I and II, alleging that the State did not prove the element that defendant held a position of trust as a substance abuse counselor, because the grand jury heard evidence only that K.P. believed defendant was a substance abuse counselor, not that he was one in fact. The motion alleged no other basis for dismissal. The trial court denied the motion.

¶ 6     After a jury trial, defendant was acquitted of counts I and III but convicted of counts II and IV. The trial court merged count IV into count II and sentenced defendant to 15 years in prison. On appeal, he contended that (1) he was denied his right to a speedy trial and his counsel was ineffective for failing to seek dismissal on that ground, (2) he was not proved guilty beyond a reasonable doubt, as the State did not prove that he held a position of trust, and (3) the trial court

considered an improper sentencing factor. See generally *People v. Turuc*, 2012 IL App (2d) 100846-U. We affirmed. *Id.* ¶¶ 1, 23.

¶ 7    In 2013, defendant initiated a proceeding under the Act. Eventually, he filed a second amended petition, alleging in part that his trial counsel had been ineffective for "failing to properly allege in a motion to dismiss indictment [*sic*] that the grand jury was misled by false testimony and deceptive evidence," *i.e.*, the testimony of Andrea Usry, a Lake County sheriff's detective, that K.P. had stayed at defendant's substance abuse recovery home in Wisconsin. Defendant noted that a trial court may dismiss an indictment if the defendant establishes that he has suffered a prejudicial denial of due process. See *People v. Oliver*, 368 Ill. App. 3d 690, 694 (2006). He argued that the State violates due process if it intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence. See *People v. DiVincenzo*, 183 Ill. 2d 239, 257 (1998).[1]

¶ 8    To lay out the factual underpinnings of defendant's postconviction claim, we reference in part the transcript of the grand jury proceeding and other documents attached to the second amended petition.

¶ 9    We begin with the grand jury transcript. Usry was the sole witness before the grand jury. She testified that, in April 2007, she started investigating K.P., a runaway minor. Usry was already acquainted with K.P. from her work as a school outreach officer in his district. She learned that K.P.'s friend had received a call from a phone that she then traced to defendant. She learned that defendant was running a purported substance abuse recovery home, "Hote Haus," in Wisconsin. Eventually, she spoke with K.P. K.P. told her that, at an Alateen meeting, he told a woman that his parents had kicked him out of the house. The woman gave him a business card for Hote Haus,

---

[1]The second amended petition raised several other claims, but they are not at issue here.

with defendant's name on it.  She told K.P. that he could call the number and that defendant could help him.  At the time, defendant was 45 years old.

¶ 10    The examination continued:

"Q. And among other things [K.P] told you that he had been with the defendant?

A. Yes.

Q. *He had been living in that substance abuse recovery home in Wisconsin?*

A. *Yes.*

Q. And among other places that the defendant took him was to a motel in Winthrop Harbor, Illinois?

A. That's correct.

Q. That's in Lake County?

A. That is.

Q. And that was on the evening of April 16, through the morning of April 17, of 2007?

A. Correct."  (Emphasis added.)

¶ 11    Usry testified that K.P. said that, late on April 16 or early on April 17, 2007, defendant entered the bedroom that he shared with K.P. and placed K.P.'s penis into his mouth, without his consent.  Soon, K.P. said he had " 'had enough,' " entered the other bedroom, and went to sleep. Several hours later, as K.P. woke up, defendant removed K.P.'s pants, rolled him over, and placed his penis into K.P.'s anus, without K.P.'s consent.

¶ 12    Usry testified that she investigated Hote Haus further and learned that defendant "was running kind of a halfway house for men that were recovering from drugs and alcohol."  He rented

the house and rented rooms to men undergoing recovery. Usry also found a web page that defendant had created for Hote Haus. Her testimony continued:

"Q. [The web page] describe[d] Hote Haus as a residence for people recovering from alcohol and who need assistance and support of living situations in order to facilitate the transition into independent community life?

A. Yes.

Q. And [K.P.] believed that the defendant was actually a substance abuse counselor?

A. Correct."

¶ 13    The second amended petition's allegations continued as follows. Usry's testimony that K.P. told her that he stayed at Hote Haus "supported the inference presented to the grand jury that [defendant] held himself out as a substance abuse treatment counselor." But when she provided this testimony, Usry knew that it was false. On April 30, 2007, Usry interviewed K.P. and generated a lengthy report based thereon. Usry's report never indicated that K.P. said or implied that he had stayed at Hote Haus. On May 2, 2007, K.P. submitted a written statement, which did not indicate that he stayed at Hote Haus. Moreover, at defendant's trial, K.P. testified that he never stayed at Hote Haus.

¶ 14    We summarize K.P.'s statement and Usry's report to the extent necessary here.

¶ 15    In his statement, K.P. wrote that, on Friday, April 13, 2007, he ran away from home and went to an Alateen meeting." There, he asked about finding a place to stay. A woman handed him a card with defendant's name and phone number. K.P. called defendant, who picked him up and let him stay at his home on Saturday night. On Sunday, he stayed with defendant and several other people in defendant's home. On Monday, he and defendant met with Mike, a friend of

defendant. Afterward, defendant and K.P. spent the night at the LaVilla Motel in Zion, where defendant sexually assaulted K.P. on Monday evening (oral) and Tuesday morning (anal). On Tuesday, after meeting with Mike again, he and defendant stayed at the Skyline Motel in Zion. On Wednesday, they met with Mike, after which defendant and K.P. drove to a funeral in Kentucky. On Friday, April 20, 2007, defendant drove them back to Illinois, where they stayed at a motel. On Saturday, K.P. stayed with a person he had met that day. On Sunday, defendant drove K.P. home.

¶ 16    In her report, Usry disclosed the following statements by K.P. After defendant picked him up on Friday, April 13, 2017, they went to an Alcoholics Anonymous (AA) meeting until 1:00 a.m. on Saturday. They then slept at defendant's home in Wisconsin. On Saturday, defendant drove K.P. to Hote Haus to meet some residents, then spent time with him at the home of defendant's friend Mark. Defendant and K.P. spent Saturday night at defendant's home. On Sunday, after he and defendant met with Mike and Janice, also a friend of defendant, he and defendant spent the night at Janice's home. On Monday, after meeting with Mike, they spent the night at the LaVilla Motel in Zion, where defendant sexually assaulted K.P. On Tuesday night, after spending the day together, they stayed at the Skyline Motel in Zion without incident. On Wednesday morning, defendant, having learned that his former AA sponsor had passed away in Kentucky, drove to the wake with K.P. and stayed two days without incident. They returned to Illinois on Friday and stayed overnight at a motel near the Wisconsin border. On Saturday night, K.P. stayed at the home of a new acquaintance. On Sunday, defendant drove K.P. home.

¶ 17    The second amended petition further alleged as follows. In moving to dismiss the indictment, defendant's trial counsel never alleged that Usry provided false or misleading testimony to the grand jury, even though K.P.'s statement and Usry's report proved that K.P. never

stayed at Hote Haus. The introduction of this false and misleading evidence, even if unintentional, violated due process. The violation was prejudicial, as the remaining evidence would not have resulted in an indictment. An element of count II, of which defendant was convicted, was that defendant occupied a position of trust in relation to K.P. At the grand jury proceeding, the State presented evidence that defendant held himself out as a substance abuse counselor *and* that he induced K.P. to believe this by boarding him at Hote Haus. Without the latter fact, the evidence would not have established probable cause to find a position of trust and, hence, the grand jury would not have indicted him on count II. Thus, trial counsel was ineffective for failing to move to dismiss the indictment based on the false testimony, and appellate counsel was ineffective for failing to argue that trial counsel was ineffective.

¶ 18    The petition proceeded to an evidentiary hearing. Usry was the sole witness. She testified as follows. On April 16, 2007, she began investigating K.P. After learning that K.P. had called a friend on defendant's phone, and informing herself about Hote Haus, she called defendant's number and left a message requesting information on K.P. On April 22, 2007, deputies brought K.P. and defendant to the sheriff's office, where defendant spoke to Usry, but K.P. would not. On April 30, 2007, after learning more about Hote Haus, Usry interviewed K.P.

¶ 19    According to Usry, K.P. recounted that, after he and defendant met, they overnighted at defendant's home in Wisconsin. They also spent an unspecified number of nights at Janice's home. During the daytimes, K.P. and defendant attended several AA meetings and met with friends of defendant. On April 16, 2007, K.P. and defendant overnighted at the LaVilla Motel, where defendant sexually assaulted K.P. On April 17, they stayed at the nearby Skyline Motel without incident. On April 18, defendant drove K.P. to Kentucky, where they attended a funeral

and lodged together for two nights without incident. When they drove back to Illinois on Friday, April 20, they stayed together at a motel near the Wisconsin-Illinois border without incident.

¶ 20 The examination continued:

"Q. So, during this time period, [K.P.] never told you that he; *** had spent any nights at Hotehaus [*sic*]; is that correct?

A. That is correct.

Q. He never told you that he was inside Hotehaus [*sic*]; is that correct?

A. That's correct, I believe.

Q. He did tell you that he was driven to that location on two occasions; is that—

A. Yes.

Q. —correct?

A. Yes.

Q. Okay. But he didn't actually go inside the building; is that right?

A. To my understanding, no; or, if he did, I don't believe he told me that he had gone inside.

Q. Okay. *** to clarify: What [K.P.] told you *** was that he hadn't gone inside?

A. (Nodding)

MR. ATWOOD [(DEFENSE ATTORNEY)]: Judge, can the record reflect that the witness nodded her head?

THE COURT: The record will so reflect."

¶ 21 Usry testified that, later on, she went to Hote Haus and observed its interior. In the interview, K.P. did not describe the house's interior or point out anything that Usry observed later in her visit. The examination continued:

"Q. During your interview *** did [K.P.] ever make any statements to you that during that time period he was engaged in *** what you could classify as substance abuse counseling conversations with [defendant]?

A. *** [F]rom my history of knowing [K.P.], I knew that he was going to meetings for those issues. And what he described was that [defendant] was helping him. And, so, from what I knew of [K.P.] and what he was going through and that that was a recovery house, I umbrellaed [*sic*] that as that would be [*sic*] their discussions; around sobriety."

¶ 22 Asked whether K.P. elaborated on his statement that defendant was "helping" him, Usry testified, "No, no more than that [K.P.] had received the card; and that [defendant] helps people who are in recovery." Asked whether K.P. ever told her that defendant was his "substance abuse counselor," Usry testified, "He did not use those words, no."

¶ 23 Usry testified that, before the grand jury, she said nothing about K.P.'s attendance with defendant at AA meetings. Further, other than the overnight at the LaVilla Motel, she was not asked how long K.P. was with defendant or where they stayed together. K.P. did not tell her directly that defendant provided him with shelter, food, and transportation. However, Usry inferred as much based on K.P.'s age (14 years old) at the time of the incident and his statement that he had no money of his own during this period. Usry confirmed that defendant paid for the room at one motel where he and K.P. stayed. K.P. told Usry that, other than the night of April 21-22, 2007, he and defendant stayed overnight together each night while K.P. remained away from home in late 2007. K.P. never told Usry that he and defendant ever stayed at Hote Haus.

¶ 24 On cross-examination, Usry testified as follows. In his interview, K.P. said that defendant took him to several places for AA meetings. K.P. told Usry that, when he ran away, he took no money with him but that defendant and Mike, who were running a check-fraud scheme, set up a

bank account for him. Asked whether K.P. gave her "any information that he understood about [Hote Haus]," Usry testified, "I don't recall." K.P. said that the woman at the Alateen meeting who gave him defendant's business card told him that defendant "had a sober-living place." Asked to explain her grand jury testimony that K.P. had believed that defendant was a substance abuse counselor, Usry testified:

"A. Given the totality of the situation and of the information that was piecemeal of saying [*sic*] that he got a card.

And I believe from reviewing my reports, \*\*\* the card \*\*\* said counselor on it, perhaps. That [defendant] has a place for people that are recovering from alcohol and drugs, for them to stay.

When I interviewed—because I had interviewed [defendant] prior to [the] Grand Jury—when I interviewed him, [defendant] told me that he was a counselor. And [K.P.] kept saying that—that he gives people help."

¶ 25 Usry testified that, during their interview, K.P. told her more than once that defendant was helping him. K.P. did not use the specific term "substance abuse counselor."

¶ 26 The cross-examination continued:

"Q. Now, defense counsel asked you about the statement regarding [K.P.] living at [Hote Haus]; and you answering [*sic*] affirmatively in front of the Grand Jury?

A. Yes.

Q. Why did you answer affirmatively if you knew he wasn't in the physical Hotehaus [*sic*] home?

A. Because, as stated in my reports, when I interviewed [defendant], he stated that [K.P.] had told him that he was 17, and that he was going to be 18 in a week or two; and that he had to be 18 to live in the house.

And during the interview, [defendant] told me that for the first week that any one new *** wants to be a part of Hotehaus [*sic*] has [*sic*] to stay with him 24/7.

So, for me that was 24/7, the umbrella of—of the Hotehaus [*sic*]. If it had not been for the Hotehaus [sic], [K.P.] would not have called; right? I mean that's—that was under the umbrella.

I guess I look at it like—can I use an analogy?

Q. If it explains why you believed—

A. Okay.

Q. —why you answered that affirmatively, yes.

A. So, you are in jail. You have drug charges. And *** you are sentenced or sent to Haymarket for three months. Are you under the authority of Haymarket, or are you still under the authority of the Court?

Q. Okay.

A. So, the Court still has an overreaching arm into *** what that defendant can do while they are at Haymarket; like, they can't have unsupervised time out when they earn it, as opposed to people that were not court-ordered."

¶ 27    Usry testified that defendant told her that, to live at his facility, a person must first be with an employee 24/7 for a week. While K.P. was with him, he was the only employee.

¶ 28    Usry testified on redirect as follows. At the grand jury proceeding, the prosecutor asked her specifically whether K.P. told her that "[h]e had been living in [Hote Haus]" and she answered,

"Yes." Asked whether she agreed that K.P. "had not been living at that facility," Usry testified, "He had not been staying in that physical facility, correct."

¶ 29 Asked whether defendant ever told her that he was a substance abuse counselor, Usry testified that he did. When asked about her testimony at defendant's trial—that defendant told her he helped people stay clean and sober but was not licensed as a counselor—Usry said she did not recall giving that testimony.

¶ 30 Asked whether K.P. ever told her he was planning to move into Hote Haus, Usry testified that she did not recall. After refreshing her recollection with her report, Usry testified that K.P. had not told her he planned to stay at Hote Haus. K.P. did say that defendant would help him find a place to stay.

¶ 31 The trial court admitted copies of the grand jury transcript, Usry's report of her interview with K.P., K.P.'s statement, and an excerpt from Usry's trial testimony.

¶ 32 After hearing arguments, the trial court denied the petition. In explaining its reasons, the trial court framed the issue as follows. If the court found that false statements had been presented to the grand jury, whether intentionally or otherwise, it had to determine solely from the grand jury transcript whether, absent the false statements, there was sufficient evidence to indict defendant. If so, there was no prejudice and a motion to dismiss would have failed.

¶ 33 Next, the trial court found that Usry's grand jury testimony that K.P. had believed that defendant was a substance abuse counselor was not false. The court explained that K.P.'s belief did not depend on whether defendant actually was a substance abuse counselor, much less on whether he was licensed.

¶ 34 The trial court then turned to Usry's grand jury testimony that K.P. had been living at Hote Haus. The trial court found this testimony "[was], in fact, false." The court specifically found:

"[K.P.] was at the Hote Haus, but he did not apparently go in and he certainly was not living there." Therefore, the court noted, it would consider the sufficiency of the grand jury evidence absent Usry's false statement. The court continued:

"So I am going to determine whether or not I believe that [K.P.] believed that the defendant was [a] substance abuse counselor and the answer is yes, he did. Clearly he did, and *** this case has a plethora of various reasons why he believed [defendant] was a substance abuse counselor, why he believed that he was in a position of trust, but the whole context of the reason he was with him was because he believed he was some form of substance abuse counselor.

It was never testified to the Grand Jury that [K.P.] believed [that] the defendant was a trained substance abuse counselor. It was never testified [that K.P.] believed that the defendant was a licensed substance abuse counselor. That he was a substance abuse counselor. Once again that is somebody who counsels somebody on substance abuse.

So the entire context under which he met [*sic*] after he'd run away was at an Alateen meeting for substance abuse. He is given a card *** identifying [defendant] with the Hote Haus *** it was clear Hote Haus is something and he can help you. Obviously that was the context. He then called the defendant. He was picked up by the defendant. He was at various points taken into substance abuse meetings. He was taken to the Hote Haus. He didn't go in. He was told the defendant ran it. The entire context of the relationship here was that [defendant] was a substance abuse counselor of some form.

There's no doubt *** for those reasons plus all the reasons the Appellate Court set forth *** that [K.P.] did believe that. So I decline *** to hold that was a misstatement to the Grand Jury, *** but let's say I agreed *** that [K.P.] believed that the defendant was

- 13 -

a substance abuse counselor [*sic*] would there be enough remaining for the indictment to stand.

So, *** I don't think this was willful. I do think it was sloppy and I do think it was lazy. It started with the prosecutor and extended to the deputy. I see this happen too often *** people clearly didn't read reports very carefully and can ask questions that were wrong and the police too often say yes, yes, yes, agreeing with everything also not having reviewed the report.

I don't think it was purposeful because there was an abundance of evidence showing the position is of trust. So, it would have been completely unnecessary. In addition it was demonstrably capable of being rebutted. [Usry's] report never said [K.P.] stated that. [Usry's] own report never stated he was living there. He was there, but he wasn't living there. And this by the way is not the reason for my ruling. I am going to make that finding [that] I don't think it was done purposely. That doesn't mean the indictment couldn't be dismissed of course.

So, what is left, let's assume I agree with the defense *** what is left is the child is a 14-year-old runaway. *** not somebody who knew the defendant at all. *** So a runaway, 14 years old was with [defendant] and using his phone.

Furthermore, [defendant], who [was] 45 years [old] at the time, was taking the 14-year-old to various different places including, once again I am not going to consider the recovery part in Wisconsin because that's wrong, to a motel in Winthrop Harbor. No other adults around, no parents around, not at this house, not somebody he knew. He was, therefore, making decisions, transporting the child, deciding to stay at a motel, giving a phone number where he could be reached which is his phone number, in essence he was

*in loco parentis* in every way to [K.P.], given the age, given lack of other parents, given his legal status as [a] runaway, given him being away from home in need of substance abuse treatment, for all those reasons I find that even were I to agree that [K.P.] did or didn't believe the defendant was a substance abuse counselor, even if I agree with the defense on that I still find that there is sufficient evidence in the remainder of the transcript to sustain the indictments.

For that reason, the defense has failed to show ineffective assistance of counsel under either *** incompetence [or prejudice] *** so the motion [*sic*] is denied."

¶ 35    This timely appeal followed.

¶ 36                                   II. ANALYSIS

¶ 37    On appeal, defendant contends that he proved that his trial counsel was ineffective for failing to move to dismiss count II of the indictment on the ground that it was obtained through Usry's false and deceptive testimony that K.P. stayed at Hote Haus.

¶ 38    At an evidentiary hearing in a proceeding under the Act, the defendant must prove, by the preponderance of the evidence, a constitutional violation in the proceeding that resulted in his conviction or sentence. *People v. Coleman*, 2013 IL 113307, ¶ 92. We must accept the trial court's factual findings unless they are manifestly erroneous. *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132. We review *de novo* issues of law. *People v. English*, 2013 IL 112890, ¶ 23.

¶ 39    To establish that trial counsel was ineffective, defendant had to prove that (1) counsel performed unreasonably and (2) it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 688, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984).

¶ 40    In contending that trial counsel performed unreasonably in failing to move to dismiss count II on the basis of Usry's false statement, defendant first notes that, as the trial court found, the statement *was* false and deceptive. K.P. never stayed at Hote Haus, and Usry had no basis to testify that he did or even that he ever went inside the building.

¶ 41    At the evidentiary hearing, Usry admitted that K.P. never stayed at Hote Haus and that she had no basis to believe even that he ever went inside. In explaining why she told the grand jury that K.P. stayed there, she construed "staying" at Hote Haus to include staying in totally separate locations, mostly in other states, with the person who ran Hote Haus. Needless to say, the grand jurors probably did not construe her testimony in this unique and tortured manner. By testifying that K.P. stayed at Hote Haus—or, perhaps we should say, agreeing with the prosecutor's testimony that he did—Usry implied to any reasonable hearer that K.P. spent at least one night there. Thus, defendant contends that (1) the trial court erred in finding that Usry did not commit perjury; and (2) even if Usry's statement was not perjurious, it was false and deceptive, which warranted moving to dismiss count II.[2]

¶ 42    Based on the foregoing, defendant contends that trial counsel performed unreasonably because, from K.P.'s statement and Usry's police report, counsel knew or should have known that K.P. did not stay at Hote Haus and that Usry had no basis to testify that he had. Defendant contends that counsel's mistake was prejudicial because, absent the statement that K.P. had been a resident of the substance abuse facility, there was no probable cause to believe that defendant had held a

---

[2]Third, defendant contends that, although there is conflicting authority on whether a subsequent conviction cures a due process violation such as the one here, the better rule is that it does not. In view of our resolution of the appeal, we need not address this issue.

position of trust relative to K.P. Defendant contends that Usry testified to almost nothing about the relationship between defendant and K.P. except that defendant took K.P. to a motel one night and that K.P. believed that defendant was a substance abuse counselor.

¶ 43 The State responds first that the trial court properly found that Usry's testimony that K.P. stayed at Hote Hause, although false, was not perjury. Based on this, the State argues that there was no due process violation or that, at the least, the dismissal would not have been with prejudice. The State contends second that the court properly found no prejudice because sufficient other evidence supported count II's allegation of a position of trust. Finally, returning to the performance prong, the State argues that trial counsel's choice of strategy was reasonable. Thus, the State concludes, defendant did not prove either prong of the *Strickland* test for ineffective assistance.[3]

¶ 44 The nub of this appeal is whether, absent the false testimony, there was sufficient evidence for the grand jury to find probable cause that defendant occupied "a position of trust" relative to K.P. See 720 ILCS 5/12-13(a)(4) (West 2006) (a defendant commits criminal sexual assault when, *inter alia*, the defendant "held a position of trust, authority or supervision in relation to the victim[ ]"). Obviously, the answer to this question depends on the meaning of the term "position of trust." Yet neither party attempts to define this term according to case authority or established principles of statutory construction. Defendant says no more than that the grand jury heard "no evidence *** from which it could conclude that [defendant] being a substance abuse counselor

_____

[3]The State also contends that the trial court properly found that Usry testified truthfully that K.P. believed defendant was a substance abuse counselor. Defendant, however, concedes this point.

meant that K.P. trusted him." Defendant appears to imply that, under the statute, the minor's trust in the adult is both necessary and sufficient to create a position of trust. Not only is this dubious on its face, but defendant cites no authority for it. The State, for its part, does not address the meaning of "position of trust" at all.

¶ 45    The meaning of "position of trust" is crucial to deciding whether the grand jury heard sufficient evidence of this element. Therefore, we shall address the issue without the parties' assistance. Fortunately, the case law is well established, consistent, and straightforward.

¶ 46    The stem case is *People v. Secor*, 279 Ill. App. 3d 389 (1996). There, the defendant was convicted of criminal sexual assault based in part on the allegation that he occupied "a position of trust, authority, or supervision" (720 ILCS 5/12-13(a)(4) (West 1994)) over the minor victim. *Secor* at 391-92. On appeal, he contended that (1) the evidence did not prove beyond a reasonable doubt any of the three alternative relationships (trust, authority, supervision) with the victim and (2) section 12-13(a)(4) was unconstitutionally vague. *Id.* at 392-93.

¶ 47    On the first issue, the appellate court noted the following trial evidence. The 14-year-old victim testified that he and his 11-year-old brother spent a night at the defendant's house visiting his son. *Id.* at 391. The victim had been there numerous times and spent the night there twice. *Id.* While the victim lay in bed, the defendant sexually fondled him several times. *Id*. The victim's mother testified that her family had known the defendant for about 10 years and that her children had overnighted at his house approximately six times. *Id.* at 392.

¶ 48    The appellate court held that the State had proved beyond a reasonable doubt that defendant's relationship to the victim fit within section 12-13(a)(4), as the evidence "raise[d] a strong inference of trust *and* supervision." (Emphasis added.) *Id.* at 394. Defendant's function in the relationship could be characterized, "at a minimum, as that of baby sitter [*sic*] or chaperone."

*Id.* On the evening at issue, he assumed "a parental or quasi-parental role." *Id.* Further, his family and the victim's family had been friends for 10 years, which would likely have generated mutual trust. *Id.*

¶ 49    On the second issue, because there was no statutory definition of "position of trust, authority or supervision in relation to the victim," the court relied on the presumption that words used in a statute have their ordinary and popularly understood meanings. *Id.* at 391, 396 (citing *People v Caffrey*, 97 Ill. 2d 526, 530 (1983)). The court relied on a dictionary definition of " 'trust' " as " '[c]onfidence in the integrity, ability, character, and truth of a person ***[;] [s]omething committed into the care of another.' " *Id.* at 396 (quoting American Heritage Collegiate Dictionary 1300 (2d ed. 1985)). The court held that section 13-4(a)(4) was not unconstitutionally vague. *Id.* The court continued:

> "It is evident that, in enacting section 12-3(a)(4), the legislature sought to prevent sex offenses by *** those in whom [a] child has placed his trust, such as the defendant. It is the trust that makes the child particularly vulnerable, and it is the betrayal of that trust that makes the offense particularly devastating." *Id.*

¶ 50    Several appellate court opinions have adopted *Secor*'s definition of "trust" and its explanation of the legislature's decision to increase the grade of a sex offense when the defendant occupies a position of trust in relation to the victim. See *People v. Miki*, 2020 IL App (2d) 190862, ¶ 55; *People v. Feller*, 2012 IL App (3d) 110164, ¶¶ 14-15; *People v. Reynolds*, 294 Ill. App. 3d 58, 65, 68-69 (1997).[4]

---

[4]On defendant's direct appeal, we also followed *Secor* and its reasoning. See *Turuc*, 2012 IL App (2d) 100846, ¶ 11.

¶ 51    With this necessary groundwork laid, we now turn to the specific issues raised on appeal.

¶ 52    The parties disagree on whether the trial court's finding that Usry's false testimony was not perjury was manifestly erroneous. We need not resolve this disagreement.  We note the general principle that, in addition to the grounds specified by statute (see 725 ILCS 5/114-1(a) (West 2020)), an indictment may be dismissed if the defendant established with certainty a violation of due process.  See *People v. Wolfe*, 114 Ill. App. 3d 841, 844-45 (1983).  In *DiVincenzo*, our supreme court stated, "The due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, *or presents other deceptive or inaccurate evidence*."  (Emphasis added.)  *DiVincenzo*, 183 Ill. 2d at 257.  This plainly means that, to establish a violation, a defendant need not establish that the State's use of deceptive or inaccurate evidence was intentional.  See *People v. Basile*, 2022 IL App (2d) 210740, ¶ 16, No. 129026 (Jan. 25, 2023) (pet. for leave to appeal allowed); *Oliver*, 368 Ill. App. 3d at 696.

¶ 53    As the trial court properly found that Usry's testimony that K.P. stayed at Hote Haus was false and deceptive, defendant established a due process violation.  We next consider whether defendant proved that the violation was prejudicial.

¶ 54    We note that the trial court found first that Usry testified truthfully that K.P. believed that defendant was a substance abuse counselor.  Defendant does not contend that this finding was manifestly erroneous, and we conclude that it was more than sufficiently supported by Usry's grand jury testimony about what K.P. told her of the events at the Alateen meeting that led to his contact with defendant.  Further, K.P.'s statement, Usry's report, and testimony from defendant's trial bolstered the court's finding that Usry was truthful in testifying that K.P. believed defendant was a substance abuse counselor.

¶ 55    Next, the trial court found that Usry's testimony, even absent the false statement that K.P. had stayed at Hote Haus, established probable cause to believe that defendant occupied a position of trust relative to K.P. This conclusion was well founded. K.P. entrusted himself to defendant's care by calling him and placing confidence in him to provide him with urgently needed help, i.e., a place to stay indefinitely. Given the context of the call and defendant's occupation as shown on his business card, defendant likely understood that K.P. would look to him for help with his substance abuse problem. It was highly probable that, when K.P. called defendant, they discussed their mutual interest in defendant's provision of counseling to K.P.

¶ 56    Moreover, as the trial court noted, Usry's further testimony, limited as it was, bolstered this evidence of a relationship of trust. Partly, this came from the unequal positions of K.P. and defendant: one was a teenage runaway in need of shelter and lacking any means to support himself on his own, and the other was a 45-year-old who took him in and supported him. K.P.'s dependence on defendant implied a relationship of trust—he had to trust defendant to do what the minor could not do himself, and defendant knew it. The subsequent events bore this out. For some period, even if only a day or two, defendant decided on K.P.'s housing, transportation, and food, paying for those essentials.

¶ 57    Defendant contends that Usry's testimony "did not include the information that K.P. and [defendant] spent days together during which [defendant] fed and housed K.P.—information that would have provided probable cause that [defendant] held a position of trust." Defendant's assertion is correct in the most literal sense: Usry did not testify *directly* that K.P. and defendant spent any specific number of days together during which defendant fed and housed K.P. (as we shall note later, this omission is surprising and disturbing.) However, Usry testified to facts from which this conclusion was a reasonable inference—indeed, the most reasonable. A young runaway

with no means of supporting himself sought shelter from an adult who took him in and accompanied him at, "among other places," a motel where they shared a room. Usry's testimony did not specify that K.P. and defendant were together on days other than April 16 and 17, 2007, but it provided probable cause to believe that, at least for these two days, defendant accompanied K.P. and fed and housed him—which, he now grants, established a position of trust. Moreover, the mention of "other places" (albeit in a leading question by the prosecutor) allowed an inference that K.P. and defendant were together for more than two days.

¶ 58    Our conclusion is consistent with the determinative case law that we (if not the parties) have discussed. Even from Usry's limited testimony (minus the false statement), there was probable cause to believe that K.P. placed " '[c]onfidence in the integrity, ability, character, and truth of a person' " and " 'committed [his well-being] into the care of another.' " *Secor*, 279 Ill. App. 3d at 396 (quoting American Heritage Collegiate Dictionary 1300 (2d ed. 1985)). Usry did not testify to a long-standing relationship of dependence of K.P. on defendant, but the case law did not require one. In *Secor*, the defendant was alone with the victim for an evening, but the court still concluded that there was a position of trust because their relationship was, "at a minimum, as that of baby sitter [*sic*] or chaperone." *Id.* at 394. Even counting only the events of April 16-17, 2007, defendant's relationship to the victim was at least as extensive as that which *Secor* concluded was sufficient under section 12-3(a)(4). (Although the *Secor* court also noted that the defendant's family and the victim's family had long known and interacted with each other, it appears that this was not crucial for the court but only further evidence of a relationship of trust. See *id.*). Also, in *Feller*, the defendant assisted a blind girl with swimming in a lake and then sexually assaulted her, the court held that a relationship of trust was proved beyond a reasonable doubt because (1) the victim, who had not known the defendant before the day of the offense, testified that she would

not have gone swimming with someone whom she did not trust; and (2) common sense dictated that guiding a blind person into an unknown body of water established a position of trust. *Feller*, 2012 IL App (3d) 110164, ¶¶ 4, 6, 14. The duration of their acquaintanceship was not material. *Id.* at ¶ 15. Again, the present case, which required only probable cause and not proof beyond a reasonable doubt, presented facts at least as compelling for finding a position of trust.

¶ 59 We turn to the ultimate issue: whether defendant proved that his trial counsel was ineffective for failing to move to dismiss count II based on Usry's false grand jury testimony. The answer is no. Defendant did not show a reasonable probability that, had trial counsel filed the motion, the result of the proceeding would have been different. Even excluding the false testimony, there was ample evidence to indict defendant for criminal sexual assault based on a position of trust. Thus, the trial court properly denied his postconviction petition.

¶ 60 By affirming the judgment, however, we do not mean to condone the provision of false information to the grand jury. Although the trial court did not find that Usry's misstatement was intentional, the court concluded that her lapse resulted from conduct that was "sloppy" and "lazy" on the part of both her and the prosecutor. We agree. The prosecutor essentially fed Usry much of her testimony, most problematically in the question that triggered Usry's false statement. This question was not merely leading—it was really a statement of fact with a raised inflection at the end. Much more importantly, it was a false statement of fact. Usry, for whatever reason, agreed with the blatant misstatement.

¶ 61 Moreover, the State made only a modest effort to present evidence to the grand jury that defendant occupied a position of trust as to K.P. Usry's lengthy report detailed how defendant and K.P. spent more than a week rarely separate from each other, traveling together, attending AA meetings and other activities together, and lodging together. The prosecutor asked about none of

this other than the initial contact between K.P. and defendant and the events of April 16-17 at the motel and otherwise made only a cryptic reference to "other places that the defendant took [K.P.]" By adding easily available evidence, the State could have avoided the postconviction claim that led to this appeal. Judicial resources have been expended to resolve an issue that could have easily been avoided.

¶ 62                                   III. CONCLUSION

¶ 63    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 64    Affirmed.